CLAMORGAN ET AL VS. LANE.

The case of Dougal vs. Fryer, 3 Mo. R, 40, affirmed.

1. A provision is a devise restraining the devisees "from using said lot *by selling, encumbering it, or pledging it,*" does not authorize the devisees to make *partition of the lot.*

2. A recital in a will as follows: "wishing and intending as far as in me lies, to place my several children on an equal footing as regards their worldly advancement, at the time of my dissolution, *and forasmuch as my second son and child Henry has been sufficiently provided for and established in the world by the will of his uncle Cyprian Martial Clamorgan, deceased,* and placed in a better situation in a pecuniary point of view than I remain able to place the balance of my children." Held: That although the will of Cyprian Martial Clamorgan was void, and the property devised by him to Henry, was in fact the property of the testatrix in the will above set out, the recital was not a ratification of the devise of Cyprian Martial, nor does it adopt such devise, nor are the heirs of the testatrix estopped from denying the validity of the will of Cyprian M.

Judge Scott dissenting on this point.

3. Mere declarations, or a promise upon some contingency to make a deed of affirmance, will not affirm the deed of an infant.

4. A deed conveying "all the right, title, claim, and interest (of the grantor) both at law and equity, to block No. 25, which property formerly belonged to J. C. and was handed down from him to his children, and willed by his son Cyprian to the said—(grantor)"—only conveys the interest which the grantor had in block 25, under the will of Cyprian; it appearing that the grantor had also an interest in said block derived from his mother, distinct from that under the will.

5. McConnell purchased a lot from C. and had his deed filed for record on the 26th. Lane having purchased the same lot from C., takes a deed, and has it put upon record upon the 27th. McConnell has a new deed made on the 26th, and recorded on the 27th, after the filling of Lane's deed for record. Lane had notice of the first deed to McConnell, but not of the second. Held: that notice of the first deed is no notice of the second. The record is not under our statute notice of a *sale*, but only of the conveyance.

*Qu.* Can a deed which has been delivered up by the grantee to the grantor to be cancelled, and has accordingly been cancelled, be afterwards set up by the grantee?

## ERROR to St. Louis Circuit Court.

Spalding & Gamble, for Plaintiffs in error.

### POINTS.

1st. The limitation in the conveyance of Clamorgan to Brazeau, and Brazeau to the children, did not restrain the children of Clamorgan from making partition before they were *twenty-five* years of age.

The words of the limitation are, that they should not be *able to use the same by selling, pledging, or mortgaging it*, before the youngest should attain the age of *twenty-five* years.

2nd. The will of Cyprian Martial Clamorgan, was made after he was twenty-one years old, and operated to pass the title to the lands described therein, although made before he was twenty-five years old, the said conveyance of Brazeau, not prohibiting such a disposition of his interest.

3rd. But even if the will of said Cyprian did not operate because he was under twenty-five years of age, yet its provision in favor of Henry, having been recognized and ratified by Apauline, the survivor of the three grantees of Brazeau, after she was twenty-five years of age, became thus effectual, and passed to him the title of such portions of the land as Cyprian had devised to him. In other language, the heirs of Apauline are estopped by her recognition and ratification of Cryprian's will in favor of Henry, as fully as if the provisions therein had been incorporated in her own. Sheppard's Touchstone, 413 (29 Law Lib. 259.) If a wife bequeath her goods, and after her death the husband connive at it, or deliver the goods, it makes the will good.

Clamorgan, et al. vs. Lane.

29 Law Lib. 433; Appendix No. 2. A will though revoked or cancelled, may be revived by republication, and such republication may be by means of another testamentary instrument, or by terms of reference embodying the will.

6th Vesey, 564; Stuart vs. Prujean. That a testamentary deposit of real estate by a paper unattested, but sufficiently referred to, in a will attested by a proper number of witnesses. See close of Romilly's argument and the opinion of the chancellor. 23 Law Lib. 198, (Loveless on Wills 371,) as to republication of Wills.

Greenleaf's Evidence 25 as to estoppel, also page 33 as to admissions that have been acted on, or have been made to influence the conduct of others, which are in nature of estoppels.

3 John. Cases 174, a recital in a will that an estate had been conveyed away, estops the heir.

4th. The first deed of Louis Clamorgan to McConnell having been made the day after he became *twenty-one* years of age, revoked the deed he had made in August of the preceding year to Lane, when he was a minor, and vested in McConnell the title of the land in question; *both deeds being for the same lands.*

As to the revocation see the following: 14 John. Rep. 124; that a conveyance of land by a person after he is of full age, is an avoidance of the deed of the same made by him while a minor; 15 Mass. Rep. 220.

Bingham on Infancy, p. 60, that a *feofment* being a conveyance performed with much greater solemnity than any other, the infant must avoid it by entry; but other conveyances can be avoided without entry. Ib. page 62-63.

10 Peters' Reports 59, Tucker *et al.* vs. Moreland. Decision to same effect as in 14th John. 124, and that a confirmation of a deed of an infant after he arrives to full age, must be by *some act of ratification.*

11 John. Reports 542, 11 Serg. & Rowle 311, as to confirmations.

5th. The taking the deed from the Recorder's office did not divest the title of the lot, and cause it to pass from McConnell back to Louis Clamorgan.

2 Henry Blackstone 263–4. Cancelling a deed does not divest the estate. 2nd John. Rep. 84. The cancelling of a deed, with the intent of revesting thereby the title in the grantor, does not produce that effect, and does not destroy the title.

7th Mo. Rep. 337, Moss vs. Anderson, that lands can be conveyed by deed only in this State.

4th Wendell 474. The return or destruction of a deed, cannot re-

vest the grantor with the title. "A title can be transferred only by deed."

4th Wendell 585. Re-delivery of a deed to the grantor does not re-vest the title in him.

8 Cowen Rep. 71. To the same purport; and the doctrine is discussed, and authorities are reviewed; cites 1st Salk. 120; 1st T. R. 151; Cro. James 399; Coke Littleton 225, note 1366.

1st. J. C. R. 240. If a deed is duly executed, in the first instance, so as to take effect, any subsequent delivery is null and void; the subsequent custody of it by the grantor, will not destroy the effect of the delivery.

9 Mass. Rep. 307, Hatch *et al.* vs. Hatch *et al.* at page 311–12, the court say "the cancelling of a deed will not divest property, which has once vested, by a transmutation of possession." "A man's title to his estate is not destroyed by the destruction of his deed."

The recorder acted illegally in giving up the *first* deed of Mc-Connell.

Rev. Code 123, sec. 31. This deed was notice to Lane by law, and the proof shows actual notice by his agent.

9 John. Rep. 163; 2 Mass. Rep. 508; 4 Mass. Rep. 638; 7 Mass. Rep. 487; 6 Wendell, 223.

6th. The second deed to McConnell, gave him a title, even if the first did not, having been executed by Louis Clamorgan, and acknowledged and delivered on the 26th July, the day before the second deed to Lane was made, and recorded on the same day that Lane's second deed was recorded, but afterwards. The second deed to McConnell was a mere repetition of the first. It was only another evidence of the same sale, and was, as it were, a continuation of the first deed. It was substituted in its stead, having been filed before the other was withdrawn; so that from the time of first filing of the first deed to McConnell, there had never been a moment when there was not of record a deed to him evidencing the sale. The second deed was not a second sale, or evidence of another bargain. In reason and for all practical purposes, it was the same deed as the first. Suppose the two had been exact duplicates, and McConnell had filed one, and then wishing to examine it at home, had withdrawn it, filing the other to remain there as its representative in its stead, and then returned and again filed the first one.

My position is, the first deed to McConnell having been filed for record, Lane by law had notice of the sale to McConnell, and in fact

by his agent had actual notice thereof, so that his is to be postponed, to that of McConnell.

As to the matter of estoppel, see Greenleaf's Ev. page 33, and page 24, section 207; p. 244, sec. 210; and p. 246 sec. 212.

The deed to Lane was not confirmed by the parol declarations of Louis Clamorgan, 11 John. 542, 11 Serg. & Rawle, 311; and 10 Peters 59; and Bingham on Infancy, 65.

*Fraud* cannot deprive Louis from revoking the deed to Lane; 1st John. Cases, 127; and 10 Peters' Rep. 59.

Thomas T. Gantt, for Defendant in error.

Hardage Lane, by his counsel, submits that the following propositions are maintainable upon the aforegoing statement, and the record in this cause, to wit:

1st. That all the interest in the lot and premises in controversy, conveyed to the children of Jacques Clamorgan in 1803, vested in Apauline in severalty by survivorship, upon the death of Cyprian Clamorgan, who died before attaining the age of (25) twenty-five years; 3 Missouri Rep. page 40, Dougal vs. Fryer.

2nd. That it appears clearly from the statements made by Apauline, and her conduct in relation to the matter, particularly from her recitals in the deed to A. Fryer, that she regarded every attempt made by Cyprian M. Clamorgan, to alienate the premises in controversy, as inoperative and void, by reason of his non-age, and that she well knew that all of said premises belonged to her alone.

3d. That at the time of the death of Apauline, she alone had the power of disposing of the premises in controversy, which embraced all of the lot conveyed by the deed to Brazeau in 1803, except so much as had been conveyed by said Apauline to Fryer, as aforesaid; 3d Missouri Dec. 40.

4th. That all the said interest of said Apauline in said premises, vested by her last will and testament in Louis, Louisa, and Cyprian Clamorgan, in equal portions, and that upon the death of Louisa, her interest descended to her three brothers, in equal portions, making the share of Louis four-ninths, (4-9,) that of Cyprian four-ninths, (4-9,) and that of Henry Clamorgan one-ninth, (1-9,) thereof; *and that the premises in controversy were devised by will of Apauline, to Louis, Louisa, and Cyprian Clamorgan, by metes and bounds.*

5th. That all the interest of said Louis was conveyed by him to Dr.

Lane, by deed dated August 20th, 1840, which said deed was confirmed. *First,* By the conduct and declarations of Louis Clamorgan, on the 24th and 27th July, 1841 ; 5 Yerger's Rep. 41 ; 4 Cruise's Dig.  Title xxxii, ch. vi. § 9 ; 1 Inst. 51 b.; also see sec. 10 of same title, chapter & vol. of Cruise's Dig.  And, *Second,* By his deed of confirmation to Dr. Lane, dated July 27th, 1841.

6th.  That the first deed, or cancelled deed, made by Louis Clamorgan to Murray McConnell, cannot be made a muniment of title to McConnell, or those claiming under him; because, *First,* The said McConnell expressly refused his assent to said deed ; in which case no title vests thereby.  *Second,* Because said deed contained no words of revocation of the deed to Dr. Lane, and is in fact not inconsistent with said deed.  *Third.*  Because said cancelled deed was fraudulent and void, by reason of the deception practiced on said Louis by Collins, agent of McConnell, in the phraseology of said deed.  *Fourth,* Because the said McConnell, in affirmance of his refusal to receive the said cancelled deed, delivered the same to Louis Clamorgan to be cancelled, and because the same was cancelled accordingly ; 4 Cruise's Dig. tit. 32, c. 24, § 18; Sheppard's Touchstone, 70 ; Hilliard's Abridg. 416 ; 1st N. H. R. 9 ; 4th N. H. R. 191 ; 10 Mass. Rep. 407 ; 1st Greenleaf 78.

7th.  The second deed from Louis Clamorgan to Murray McConnell, cannot operate to the prejudice of Dr. Lane, because before the same was recorded, or any notice thereof, actual or constructive, was given to said Lane, or his agent, the deed of confirmation from said Louis to Dr. Lane was executed and recorded.

8th.  That the attempt by McConnell to purchase of Louis Clamorgan the premises in controversy, knowing as he did, from the record, and by actual notice, that Louis Clamorgan had already conveyed his interest therein for a valuable consideration to Dr. Lane, was a fraud in fact, and a fraud in law.  2 Kent's Com. 240 ; 4 Cruise's Dig. 442 ; 2 Barn. & Ald. 367.

9th.  The conduct and statements of Louis Clamorgan, on the 24th of July, 1841, and afterwards, are sufficient to confirm the deed dated August 20th, 1840, and no re-delivery of the first deed dated August 20th, 1840, could have given such confirmation a higher sanction. 4 Cruise's Dig. 31.  As to the first proposition see 5th Yerger's Tennessee Rep., page 41.  2 Kent's Com. 237.

10th.  If an infant wishes to rescind a contract of sale or purchase made by him, and *executed* during his minority, he shall, at the time he repudiates such executed contract, return the consideration.  Roof vs.

Stafford, 7 Cowen's Rep., 179.   In the case at bar, it is not pretended that the consideration  paid by Lane was ever returned by Louis Clamorgan.    See also 4 Cruise's Dig. title 32,  ch. 6, § 9, § 10; 1 Ins. 50 b, 51 b, 1st Thomas Coke 177, 2 do. 448.

11th.  The representation by Louis Clamorgan himself, that he was of full age, or twenty-one years old, on or before August 20th,  1840, was a fraud in fact by him  practiced on Dr. Lane, of which neither himself or those claiming under him shall be allowed to take advantage.    2 Kent's Com. 240 ; 4 Cruise's Dig. 442 ; 2 Barn & Ald. 367. Contra 1st Johns. Cases 127.

12th.  That the will of Cyprian was absolutely void and incapable of confirmation, as to the premises in controversy,  though as to any other realty it might have been valid.  3d Mo. Rep. 40 ; Sheppard's Touch-stone 211,  313 ; 4 Cruise's Dig. 91 ; 2 Thomas  Coke 416 ; 6 Cruise's Dig. 14, 15.   If upon the facts  disclosed by the record and bill of exceptions,  the verdict seems to be correct, and can be supported consistently with the rules and principles of law, the judgment of the circuit court will be affirmed.

13th.  That the deeds of Charles Collins, as guardian of Louis and Louisa Clamorgan, and Henry Clamorgan,  he being appointed to that office by the will of Cyprian, no title  passed to the lot in controversy, except such  as came  to said wards by devise or  descent from said Cyprian.

NAPTON, J. delivered the opinion of the court.

At the July term 1842, of the St. Louis circuit court, Hardage Lane filed his petition for the partition of a part of block No. 25, in the city of St. Louis. The lot is described in the petition as follows : Beginning at the  south-east  corner of block 25, at the intersection of Main and Oak streets,  and running  thence northwardly along the western edge of Main street, forty-three feet to the south-east corner of a lot of Sylvester Pratte ; thence westwardly with the southern line of said Pratte's lot one hundred and ten feet; thence  northwardly along the western boundary of said Pratte's lot, eighy six feet, to the northwest corner thereof ; thence westwardly and  parallel with Oak street one hundred and ninety feet to Second street ; thence along the eastern edge of Second street southwardly to the southeast corner of said block, one hundred and twenty feet; thence eastwardly along the northern edge of Oak street, three hundred feet to the beginning.   The petition stated that Lane was the owner of two parcels of said land in severalty and

by virtue of a deed from Louis Clamorgan, was entitled to a portion of the residue. The facts upon which this title is founded, are briefly stated in the petition, and from this statement as well as the evidence submitted in support thereof, appear to be as follows :

On the 8th of November, 1803, the piece of ground above described, was conveyed by Jaques Clamorgan to Joseph Brazeau, and by the same instrument was, together with sundry slaves, conveyed by said Brazeau, in consideration of natural affection, to St. Eutrope, Cyprian Martial and Apauline Clamorgan, natural children of said Jacques Clamorgan, "that they might dispose of the whole as of property pertaining to them, by full title and legitimately acquired, under the charge and condition of not being able to use the same, by selling, pledging, or mortgaging it before the youngest of the three should attain to the age of twenty-five years complete, at which time they all unanimous, and with one consent, can dispose of said property at their free will and pleasure; and in case the said boy and girls shall die, without leaving children of their own, the aforesaid lot of slaves shall remain the property of their said father Jacques Clamorgan, and in case any one of the three shall die before the age of twenty-five years, or afterwards, those who remain alive shall be the heirs of him, or her, or them who shall have died, that is, if those deceased have no children, then such children shall be heirs of the deceased father or mother."

St. Eutrope Clamorgan died more than twenty years before the trial without children ; Cyprian died in 1827, without issue ; Jacques Clamorgan died in 1813 or 1814; and Apauline died about the 18th April, 1830, being a week after the date of her last will, leaving four children, Louis, Henry, Louisa, and an infant a few days old, named Cyprian, born after her will was made. Louis the eldest son, was born on the 25th of July, 1820; Louisa died, without issue, sometime in the year 1834.

On the 15th November, 1826, Cyprian Martial Clamorgan, and Apauline Clamorgan, (St. Eutrope being dead,) made their deed of partition, which was acknowledged by them on the 22d of February, 1827, and was duly recorded in July of said year.

29

Clamorgan, et a . vs. Lane.

⌐ The following diagram will exhibit the portions allotted to Cyprian and Apauline:

to Cyprian was allotted lots numbered 1, 2 and 3, and to Apauline lots numbered 4 and 5.   The deeds contained covenants of quiet enjoyment against the parties, and all claiming under them.

On the 22nd February, 1827, Cyprian Martial Clamorgan made his last will and testament, which was admitted to probate on the 27th May of the same year.   In it is the following clause:  "Item—I give and bequeath to Henry Clamorgan, now an infant of five or six years of age, who is the second natural son of my natural sister, Apauline Clamorgan, in full right and property, to have and to hold, to him and to his assigns forever, in fee simple, a lot of ground, of which I now stand seized and possessed, situate, lying and being in the city of St. Louis, and is bounded on the east forty-three feet by the first or Main street of said town; on the north seventy-two and a half feet, more or less by a lot of Sylvester Pratte; on the west forty-three feet, by a lot of said Apauline Clamorgan; and on the south by a cross street which separates said lot from the Missouri Hotel, which said lot is situate on block No. 25, in the plat of the city of St. Louis.   Item—I give and bequeath in like manner, to the said Henry Clamorgan, and to his heirs and assigns forever, a small stone building, situate on said block No. 25, bounded on the east by the stone house of the said Apauline Clamorgan, seventeen feet, an  small plat of ground attached to said house,

bounded as follows, to-wit: Bounded on the east by the said stone house of the said Apauline Clamorgan, twenty-nine feet, more or less; on the north by a small lot or square of ground belonging to the said Apauline, thirty-two feet; on the west by a twelve feet alley, twenty-nine feet more or less; on the south by a cross street thirty-two feet, which said cross street separates said lot from the lot whereon stands the stone house called the Missouri Hotel, which said lots are to be leased out," &c. These two lots are numbered *one* and *two* on the plat, and had been allotted to Cyprian in the deed of partition.

By the same will Cyprian devised "in like manner to Louis and Louisa Clamorgan, the infant son and daughter of his said sister Apauline Clamorgan, to have and to hold as tenants in common, and to their heirs and assigns forever, a lot of ground situated in block No. 25, (describing said lot particularly,) which is lot No. 3 in the deed of partition, and directs that if said Louis or Louisa Clamorgan should die before partition of the lot between them, without issue of their bodies, then the survivor should have and enjoy the whole lot in fee simple." No partition was ever made of the lot between Louis and Louisa Clamorgan.

Lot No. 5 was conveyed by Apauline Clamorgan, first to Charles Collins, before she was twenty-five years of age, and afterwards by a deed executed after she was twenty-five, to Alexander Fryer, whose trustees conveyed it to Hardage Lane, who is still the owner. See Dougal vs. Fryer, 3 Mo. Rep. 40.

On the 11th April, 1830, Apauline Clamorgan made her will, which was duly admitted to probate on the 12th May, 1830, and recorded in the office of the recorder on the 24th August, 1840. From this will, the following is an extract: "Wishing and intending as far as in me lies, to place my several children on equal footing in a pecuniary point of view, and as regards their wordly advancement, at the time of my dissolution, and forasmuch as my second son and child, Henry, has been sufficiently provided for and established in the world by the will of his uncle Cyprian Martial Clamorgan, deceased, and placed in a better situation in a pecuniary point of view than I remain able to place the balance of my children, therefore I will ordain and require of my executor hereinafter named, so to execute this, my last will and testament, that said Henry shall receive no portion, nor any part of any real estate except as hereinafter mentioned, but shall only be entitled to his equal portion of the proceeds of the personal property which I may leave at the time of my death. Item—1 do hereby give, bequeath and devise to my children in equal proportions, to be equally divided amongst them,

to-wit: Louis, Louisa, and any and all other children which may here-after, before my death, be born to me, a certain lot, parcel or piece of land, situate, lying and being in the city of St. Louis, county of St. Louis, State of Missouri, bounded south by a cross street, commonly called Oak street, west by Second, Main or Church street, and north by property now or late the property of Laprize & Pratte, the property hereby and herein bequeathed and devised being all my right, title, interest and property of, in and to a certain larger lot or quantity of land, heretofore, to-wit: On the 8th day of May, in the year of our Lord 1803, by Joseph Brazeau, for and through Jacques Clamorgan, conveyed to St. Eutrope, Cyprian Martial, and the said Apauline Cla-morgan, the testatrix, which said lot contained the quantity of one hun-dred and twenty feet front by three hundred feet in depth, being in block No. 25, on the plat of said city of St. Louis." The testatrix then relinquishes to Fryer a certain mortgage, which he had made her on lot No. 5, and devises and bequeaths to her children, Louis, Henry, and Louisa, and any and all others thereafter to be born to her, and to the survivor or survivors of them, and their heirs and assigns, all the interest and estate which she had in any land, lots or houses within the State of Missouri.

Lot No. 2, being 32 feet on Oak street by 29 feet deep, was conveyed by deed dated 27th August, 1832, to Elijah P. Harris by Charles Col-lins, guardian of Henry Clamorgan, who was authorized to convey by the St. Louis county court, and afterwards by said Harris to Dunham Spalding, on the 15th August, 1833, and by said Spalding to Charles Collins, by deed dated June 10th, 1834, and all the estate conveyed by D. Spalding to Collins, was vested in John Stacker and Andrew Erwin by sheriff's sale.

Lot No. 4 was sold by the administrator of Apauline Clamorgan by order of court to Louis Clamorgan, and the petition alleges that this was owned in severality by Lane, and there is therefore no question as to this portion of the ground.

On the 20th August, 1840, Louis Clamorgan, then being under 21 years of age, made his deed to Hardage Lane of that date, conveying all his, said Louis' right and estate in the whole piece of land conveyed by Brazeau, being his undivided interest therein, and also his interest in a part in severality. His undivided interest is stated as a third. His deed was recorded on the day of its date.

On the 26th July, 1841, a second deed was made by Louis Clamor-gan to Lane, which was acknowledged on the 27th, and recorded on

that day, at or before 9 o'clock, A. M., reciting the former deed and ratifying and confirming it.

On the 26th July, 1841, Louis Clamorgan made his deed to Murry McConnell, which was acknowledged on the same day, and filed in the recorder's office. By this deed Louis and his wife granted bargained and sold "all his right; title, claim, and interest, both in law and equity, to block No. 25, situate in the city of St. Louis, bounded on the east side by Main street, on the west by Second street, on the north by Cherry, and on the south by Oak street, which property formerly belonged to Jacques Clamorgan, and was handed down from him to his children, and willed by his son Cyprian M. Clamorgan to the said Louis Clamorgan, to have and to hold, &c. &c."

On the 26th July, 1841, a second deed was executed by Louis to McConnell, and on the 27th, Louis' wife joined, and it was recorded on the 27th, after the deed to Lane had been recorded. By this deed, Louis and wife, in consideration of seven thousand dollars, sold all their claim and interest in Block No. 25, (describing it.) The deed to Lane, of August, 1840, is expressly abrogated and disaffirmed, on the ground that he (Louis) was a minor at the date of its execution.

The particular circumstances attending the execution of these three last named deeds, will be found detailed in the testimony of Gantt and Collins, which testimony will be hereafter set out in full.

In July, 1841, McConnell and wife conveyed to January & Dunlap, the western part of Lot No. 3, containing 70 feet front on Second street by 110 deep.

In August, 1832, Charles Collins, guardian of Louis and Louisa Clamorgan, executed his deed to Samuel Gaty, conveying the eastern part of lot No. 3, which is about 78 feet from east to west, and comprehending the whole width of the lot from north to south. This deed was made by virtue of a sale under order of the county court.

T. T. Gantt, a witness on behalf of plaintiff testified that he was employed by Dr. Lane, in August 1840, to examine and report as to the title of Louis Clamorgan to the lot in block 25, which he did. He was then directed to prepare a deed conveying to Dr. Lane the interest of said Louis, which he did, and the deed so prepared was the deed given in evidence, dated August 1840. Before this deed was executed, witness suggested to Dr. Lane, the propriety of making some enquiry into the age of Louis, and Dr. Lane thereupon desired Louis to bring him a transcript from the baptismal registry. Dr. Lane was in the office of witness when Louis brought in a piece of paper, on which was a memorandum to the effect, that Louis had been baptised in July

Clamorgan, et al. vs. Lane.

1819. The writing was in the upright peculiar hand of a Frenchman. Dr. Lane expressed himself satisfied, and Louis executed the deed either that day or the day after. It was executed on the day of its date. Witness was present when it was executed, and delivered to Louis, Dr. Lane's check on the Gas Light Company, for four thousand one hundred and seventy dollars, and a bond payable on condition. for one thousand dollars more, which was the consideration of said deed. The deed was then recorded. Some time afterwards, probably in the spring of 1841, Dr. Lane told witness that he was afraid Louis was not of age when the deed was executed, and desired witness to ascertain whether Louis would ratify the said deed. Witness saw Louis, who said he fully believed he was of age, when the said deed was made, that he still so believed, but that he would make a deed of confirmation to satisfy Dr. Lane, as soon as his next birth day came. His birth day was on the 25th July, 1841. Witness sent for him on the 24th July, 1841, and asked him to execute the deed of confirmation—this was Saturday. Louis said that he was perfectly willing to do so, that the land was Dr. Lane's, who had fairly paid for it, and that he would execute a deed as soon as he was of age. Witness told him that he was of age that day, and handed him a deed of confirmation. Louis read it, and said he wished to be discharged from the covenants contained in the original deed, to convey to Dr. Lane whatever interest in said block he might acquire by inheritance upon the death of his brothers. Witness told him he was not authorized to make such a discharge. An attempt was then made to see Dr. Lane, but he was not at his office. Witness then again urged Louis to execute the deed of confirmation. Louis replied that the land already belonged to Dr. Lane; that he would come in on Monday morning, (26th July) and execute the deed, and then Dr. Lane could discharge him from said covenant. Witness prepared the second deed from Louis to Dr. Lane, which has been referred to, dated July 26th, 1841. Louis did not come to the office of witness on Monday morning. Witness sent several messages to him to his home, but did not find him during the whole of that day. Early on the morning of the 27th, before witness was dressed, Louis came to his office. The chamber of witness adjoined his office. Witness asked Louis why he had not come to execute the deed the day before. Louis replied "*they would not let me.*" Witness asked who he meant by "they." Louis replied, "*Collins, McConnell and them,*" and Louis added, "I have made a deed to McConnell of the title I got from uncle Cyprian." Witness told him that this was very wrong, and that he had no title from his uncle

Cyprian. He said he knew it was wrong, but that as witness had told him before that he got no title from his uncle Cyprian, he thought he could not hurt Dr. Lane by conveying *that* to McConnell. Witness told him he would go to breakfast, and on his return would take his acknowledgment of the deed of confirmation, and then go to the recorder's office, and determine upon his subsequent course. Immediately after breakfast Louis accompanied witness to a justice of the peace, and acknowledged the deed of confirmation. He then went with witness to the recorder's office. Witness asked for the deed from Louis Clamorgan to Murray McConnell, and one of the clerks handed it to him. Witness read it, and told Louis it was a deed of his *entire* interest in the block—that it was not worth while to put Dr. Lane's deed on record. Louis protested earnestly that it was not so intended, and declared that he had been imposed upon by McConnell, if the deed conveyed any thing but the interest which he, Louis, derived from his uncle Cyprian—but he thought witness must be mistaken as to the effect of this deed, because he said McConnell wanted a quit claim deed of the entire interest of said Louis, but he refused to give it. Witness believing that there was fraud in the affair; resolved to place Dr. Lane's deed on record, and endeavor to avoid the deed which Louis had given to McConnell. Witness then left the recorder's office and returned to his own, and remained there till about three o'clock, when Louis came into it, bringing with him the deed which witness had seen on file in the morning, and saying, "I told you that McConnell wanted a quit claim deed—and I have given him one. He has given this up to be destroyed, and I have brought it to you for that end," or words to that effect. Upon looking at the deed which Louis thus placed in the hands of witness, he (witness) immediately went to the recorder's office, and there found the second deed to McConnell, which has been read in evidence. Witness asked Mr. Lacey how long it had been filed. Mr. Lacey said, "about half an hour." Witness asked Mr. Lacey at what time the deed to Dr. Lane was filed. Mr. Lacey said, "early in the morning." Witness desired him to mark the hour particularly. Lacey said he could say with confidence, it was filed before 9 o'clock, and marked it accordingly at request of witness, and also marked it "1st" to indicate its priority. Witness returned to his office, and on the same day made a memorandum of all the facts here detailed, which he has preserved.

Charles Collins being produced as a witness testified, that some time in the year 1839, he as the agent of Murray McConnell, made an agreement to purchase from said Louis, all his interest in the property

in question, but it was not carried into effect till 1840; that this trade was made at the solicitation of said Louis himself, the consideration on McConnell's behalf, was a house and lot on Broadway, considered worth seven thousand dollars, and perhaps some money; that property then rented for five hundred and fifty dollars per year, and was made over to said Louis, and he took possession and received the rent; that witness knew that said Louis was not of the age of 21 years, but Louis had been under witness' care and had lived with him, and he had full confidence in his word, and believed that he would fulfil his agreement; said Louis gave his bond to convey his interest as aforesaid, when he became of age; on Monday, the 26th July, 1841, Louis came to witness, who wrote the deed first made to McConnell by him and which has been read in evidence in this case, and said Louis executed, acknowledged and delivered the same, and it was deposited in the recorder's office on the same day, at about ten o'clock in the forenoon; about an hour after said deed was filed for record as aforesaid, said McConnell who lived in Illinois, arrived in St. Louis, and asked witness if the deed had been made and recorded, and witness replied in the affirmative, he then enquired whether Louis' wife had signed, and on being informed that she had not, Louis was sent for and another deed was immediately drawn, which is given in evidence in this suit, and the second made by Louis to McConnell; this last mentioned deed said Louis executed and acknowledged in the afternoon of the same day (the 26th July;) he acknowledged it before justice Hyde, who promised witness that he would go and get the signature and acknowledgment of said Louis' wife, and then file the same deed for record in the recorder's office, before the other deed to McConnell was taken from the recorder's office. That said Hyde took an order from McConnell to exchange the deeds as soon as the last named one should be acknowledged by the wife and filed. The bargain with Louis was, as first made, for the whole of his interest in said property however acquired, and the purchase by McConnell was not confined to Louis' interest under said Cyprian; that witness was McConnell's agent; that Louis took possession of said house on Broadway, several months before he made the deed to McConnell; Louis collected the rent of said house himself; there was no difficulty about the annual rent, and witness told Louis to collect it himself, and he did so. The amount of rent was at first six hundred dollars, then five hundred and fifty, and afterwards lower. That there was no constraint on Louis to obtain the deeds to McConnell, but each of said deeds from him to McConnell, entirely voluntary on the part of Louis, and what he said about con-

straint or coercion is a fabrication. McConnell was willing to cancel the trade, and witness now thinks he made a very bad bargain for Mc-Connell in the transaction. The said first deed to McConnell was not withdrawn to get the signature of the wife thereto, because McConnell chose that it should remain of record, until another deed was made and executed by her and Louis and recorded, before the first should be withdrawn; that the lot given by McConnell to said Louis was on Broadway; that witness has conversed with the plaintiff since said deeds were made, and Lane said that Louis had deceived him, that he thought Louis of age when he bought—that witness for McConnell proposed to settle their controversy respecting said land, under said deeds of Louis, and said Lane referred him to said Gantt as his agent to settle; saying that any thing he, Gantt, should do in the matter he would approve of; that he then thought the lot on Broadway given by McConnell to Louis worth seven thousand dollars, that he was offered twelve thousand dollars for said lot and another adjacent of same size, and refused it. That the claim of the President and Directors of Public Schools, covers about half of the front of said lot; that he, the witness, formerly owned said lot; thinks it probable that this lot was included in the deed to Stacker & Erwin by McConnell, and if so, that this was put in for McConnell's benefit, to carry out the arrangement of McConnell with Louis; that he did not know when Louis made the sale to Lane; that said Louis was with the witness in his store several years, and left him in the year 1838, and went into business for himself, and had ever since been acting for himself. Louis while with witness, sometimes made out plats for witness, but witness never instructed him how to deal in real estate; that he was under charge of witness from five years old till 1837 or beginning of 1838, when he set up for himself, and had ever since been acting entirely for himself. Louis gave a bond or written contract to McConnell, who approved of it, though it was known he was not of age, but they relied upon his word; this contract was never recorded. Witness mentioned this bond or contract to Rucker who had leased the property and assented to have it for a longer time; that he witness had no notice or knowledge of the sale to Lane by Louis, till long after the said trade with McConnell, and when he first had any knowledge of it, it was mentioned to him by a third person, and he then went and examined the records, and found that it was true. This was before the deed was made to McConnell in 1841. That he witness, has sold all his interest in the lot of thirty-two feet by twenty-nine feet, and has no interest in this suit. The property conveyed to said Louis, is one of the stone houses, situate on Broadway; was part

of the property sold as mine, under executions held by Stacker & Erwin, at the time all my interest was sold, and it did not satisfy the debt. I made afterwards an arrangement with Stacker & Erwin, by which they transferred all of the property bought at sheriff's sale as aforesaid to Murray McConnell, the stone house aforesaid among the rest, Murray McConnell gave them his notes for the whole of the debt due from me, and executed a deed of trust upon the whole property, the stone house aforesaid inclusive, to secure the payment of those notes.   The lot of 29 feet by 32 feet on Oak street, part of the premises involved in this proceeding, was also included in this arrangement with Stacker & Erwin, by which I was to have the balance of the property after the debt to Stacker & Erwin was paid, and that arrangement is still subsisting.   The court having asked the witness whether this arrangement with Stacker & Erwin was evidenced by an instrument of writing, the witness answered yes, whereupon the court excluded the above evidence in regard to same, to which exclusion, the plaintiff by counsel excepted."

The testimony of the clerks in the Recorder's office, confirmed the statements of Mr. Gantt, in relation to the time of the filing of the deeds, from Louis to McConnell and to Lane.

The deed from Louis Clamorgan to Murray McConnell, which had been filed for record on the 26th July, 1841, and which was afterwards withdrawn by McConnell and delivered up to Gantt, and by him cancelled, was offered in evidence by the plaintiff in error; but the court refused to permit the said cancelled deed to be read, except for the purpose of showing notice to Lane of the deed substituted for it.

It was admitted that any interest which McConnell may have acquired by any of said deeds, was sold at sheriff's sale to Gaty, McCune & Glasby in July, 1843; and that Henry Clamorgan conveyed all his right to a portion of said lot bounded south by Oak street, west by the lot conveyed by Fryer to Lane, north by the northern boundary of said lot of Lane produced, and east by an alley, to Gaty, McCune & Glasby, in July, 1843.

The plaintiff below, to show that Apauline Clamorgan regarded herself, upon the death of Cyprian, the sole owner of the lot described in the deed to Brazeau, read in evidence her deed to Fryer.   In this deed it is recited that Cyprian Clamorgan died before he had any power or authority in any way to dispose of his interest in said lot.

The court, upon motion of Lane, gave the following instructions: "If the jury find from the evidence that Louis Clamorgan, as soon as he arrived at full age, executed a deed for the premises in controversy,

to Murray McConnell, and afterwards another deed for same premises to Lane, that deed of McConnell was taken to Recorder's office and withdrawn within less than a day, before being copied on the record, (the certificate of filing being erased by the officer) and returned by McConnell to Clamorgan, with the intent of recalling the same and rendering it ineffectual; and that afterwards Lane's deed was filed for record, and that after Lane's deed was so filed, another deed from Louis Clamorgan to McConnell for the same premises and others, (made after Lane's deed, and taken by McConnell from L. Clamorgan at the time Clamorgan's first deed was returned to him as aforesaid) was recorded, that Lane's deed conveys Clamorgan's title unaffected by the prior deed of McConnell, subsequently returned to Clamorgan. If the jury find from the evidence that the agent of Dr. Lane brought his deed to the Recorder's office for record, and there, before recording same, learned that a deed had been made to McConnell, such knowledge doth not impair the conveyance to Lane."

The court also gave the following instructions: "If the jury find from the evidence, that Louis Clamorgan, as soon as he became of age, executed a deed for premises in controversy, to Murray McConnell, and that afterwards on Louis' giving said McConnell another deed for same on other premises, first deed. was given up to said Louis, with the intent of recalling the same and rendering the same ineffectual, and that the said deed was only given for the delivery up of the first as aforesaid, said McConnell, and any person claiming under him, is estopped from setting up said first deed.

The court also gave the following instructions at the instance of the defendants: "That the sale and deed by Charles Collins, as guardian of Louis and Louisa Clamorgan, to Samuel Gaty, given in evidence, passed all the title of the said Louis and Louisa, in the portion of the ground embraced therein, to said Gaty: "that the sale and deed of Charles Collins, as guardian of Henry Clamorgan, given in evidence in this case, to Elijah D. Harris, passed all the estate and right of said Henry in the portion of ground embraced in said deed : "that if Gantt was the agent of Lane in examining the title, and making the conveyance, and recording the same from Louis Clamorgan to said Lane, of his right in the property in question, then notice of another deed or title from said Louis to said McConnell is notice to Lane."

The defendants asked the following instructions, which were refused: "That the lot of 32 feet by 29 feet, set off to Cyprian M. Clamorgan, in the partition given in evidence between him and Apauline, and in his will given to said Henry, which will, in this respect, is ratified by the

will of said Apauline given in evidence, was the sole property of said Henry at the time of said sale of the same by Chas Collins, his guardian."

"If the jury believe from the evidence, that Louis Clamorgan sold his interest in said block 25, comprehending the land in question, in 1839 or 1840, to McConnell, while under the age of 21 years, and after he was of the age of 21 carried the same into effect by his deed given in evidence, to McConnell, and that said Lane or his agent had actual notice thereof, when the said second deed to Lane was filed for record, they are bound to find against said Lane's title under that deed."

"If the jury believe from the evidence, that Louis Clamorgan was under the age of *twenty-one* years when he made the first deed given in evidence, to Hardage Lane, and that after he became 21 years of age, and before he executed the second deed given in evidence to said Lane, he made and delivered the first deed given in evidence to McConnell, and the same was recorded, and remained of record till after the second deed to McConnell was made and filed for record, then the title of McConnell to the property in said deed mentioned, is better than that of Lane, so far as said Louis was able to make title."

"That if when Louis Clamorgan's second deed to Lane was recorded, the said Lane or his agent had notice of another prior conveyance made by said Louis, after he was of the age of 21 years, to McConnell, then said Louis's second deed is to be postponed to said McConnell's deed."

"If the jury believe from the evidence, that Louis Clamorgan made his deed to McConnell soon after he came of age, of his interest in the property in question, and that the same was filed for record in the Recorder's office in St. Louis county, and that after the making and filing the same as aforesaid, said Louis made his deed of the same property to Lane, and the same was recorded by Lane's agent, who before and at the time of recording it, had knowledge of the said deed to McConnell, and that afterwards said McConnell filed for record the other deed of said Louis, conveying to him the same property, and carrying into effect the same sale, and at the same time withdrew from the Recorder's office his said first deed, with the intent of cancelling it, the jury are bound to consider the title of said Louis unaffected by said deed to Lane."

That the recital in the will of Apauline Clamorgan, as follows:— " Wishing and intending, as far as in me lies, to place my several children on equal footing in a pecuniary point of view, and as regards their worldly advancement at the time of my dissolution, and forasmuch as my second son and child Henry has been sufficiently provi-

ded for and established in the world by the will of his uncle Cyprian Martial Clamorgan, deceased, and placed in a better situation in a pecuniary point of view, than I remain able to place the balance of my children," is a ratification on her part of all the provisions made by the last will of Cyprian Martial Clamorgan in favor of said Henry, in effect makes such provisions in favor of said Henry part of her testamentary disposition, and estops her heirs and all claiming under them from claiming any property limited to Henry Clamorgan, by the last will of Cyprian Martial Clamorgan aforesaid."

The jury found, in substance, that Lane had no interest in so much of said premises as had been sold by Charles Collins, as guardian of Louis and Louisa Clamorgan, to Samuel Gaty : that as to the remainder of the premises sought to be divided, Hardage Lane was seized in fee simple of four-ninths thereof : that the interest of the said Henry Clamorgan had been, until disposed of, one-ninth thereof: that said Henry Clamorgan had conveyed all his interest in and to the lot fronting on Oak street, 29 feet in front by 32 feet deep, to Stacker & Erwin, which interest was one-ninth thereof, and that the remaining parties to the action are not co-tenants or part owners, except as in said verdict is set forth.

A motion for a new trial was made and overruled, and the case is brought here by writ of error.

Most of the points discussed in this case arise out of the instructions given or refused by the circuit court. Some of them will be but briefly noticed, having been, as we conceive, settled by a previous decision of this court. We allude to the case of Dougal vs. Fryer, determined by this court in 1831. That decision, in our opinion, constitutes a sufficient answer to the first three positions assumed in behalf of the validity of Cyprian Clamorgan's will. These positions were, *first*, that the limitation in the deed to Brazeau, fixing the period of majority in the children of Clamorgan at the age of twenty-five, was rendered null and void by the introduction of the common law in 1816, which fixes the period of majority at twenty-one : *secondly;* that admitting the restriction valid, a partition of the land between Cyprian and Apauline was not embraced by the terms of that instrument, which merely prevented the donees "from using the said lot, by *selling, encumbering it,* or pledging it ;" and therefore, *thirdly,* that the will of Cyprian, made after he was twenty-one, though before he was twenty-five years of age, was valid.

We are unable to see how the validity of the restriction in the deed to Brazeau, connected as that restriction is with a life estate and cross

remainders in the three children of Clamorgan, can be reconciled with the assumption of a right to make partition. The effect of such partition must be to destroy the cross remainders, and place it in the power of either party to sell *eo instanti*, the partition is effected. And this would be merely an indirect mode of annulling the restriction. We suppose the provision in the Brazeau deed, which prohibits the children of Clamorgan from selling, encumbering or pledging the lot conveyed, was designed to prevent any *alienation* of it until the period fixed in the deed; and partition, which is a form of alienation, is within the spirit of the restriction. Consistently with the decision in the case of Dougal vs. Fryer that partition cannot be sustained, nor the will of Cyprian which succeeded it. Since this decision, as it appears from this record, several conveyances of different portions of this lot have been made, and upon this state of facts the court does not feel itself at liberty to enter into any examination of the propriety of that decision.

The second general proposition arising on the record before us, relates to the construction of Apauline Clamorgan's will. This will, it is said, either confirms the will of Cyprian, or by implication adopts its provisions; or at all events, it operates as an estoppel, so as to prevent the devisees, under the will of Apauline, from claiming any thing to the prejudice of Henry's claim, under the will of his uncle Cyprian Clamorgan.

The instruction asked on this head, embracing, we presume, the position designed to be taken on this point, is as follows: "The recital in the will of Apauline Clamorgan, as follows: 'wishing and intending as far as in me lies, to place my several children on an equal footing, and forasmuch as my second son and child Henry has been sufficiently provided for, and established in the world by the will of his uncle Cyprian Martial Clamorgan, deceased, and placed in a better situation, in a pecuniary point of view, than I remain able to place the balance of my children,' is a ratification on her part of all the provisions made by the last will of Cyprian M. Clamorgan in favor of said Henry, in effect, makes such provision in favor of said Henry part of the testamentary disposition, and estops her heirs and all claiming under them, from claiming any property limited to Henry Clamorgan aforesaid."

It is not easy to understand what is meant by the term *ratification* in this instruction, if it be designed to advance any other proposition, than that of a devise by *implication*, or estoppel, as maintained in the latter part of the instruction. A ratification of an instrument must be made by the person or power which attempted to create it. The voidable deed of an infant may be confirmed by his act, after he arrives at

years of legal maturity, but a will can never be merely voidable, for the person who makes it must be out of existence before it can be a will. Upon the death of the testator, his testamentary disposition of his property is either a will, valid and binding upon every one, or it is a nullity, and no subsequent act of any one can revive a nullity. It is true that another may adopt that instrument which purports to be a will, or so embody its provisions, as to make it a part of his own. It then derives its validity solely from the act of the person adopting its provisions; and this brings us to the consideration of the latter branch of the instruction, wherein it is claimed, that the will of Apauline Clamorgan, by implication, adopted the provisions of the will of Cyprian Clamorgan.

If Apauline Clamorgan believed that her son Henry, already had a title, independently of any act of hers, and that belief is to be fairly inferred from the language of this recital, how can it be maintained that she intended to exercise any power of disposition in his favor? Though she may be influenced in the disposition of her property, by this supposition, yet it does not follow that she intends to give to Henry that benefit, to which, she takes it for granted, he is already entitled. How are we to come to the conclusion, that in the event of the failure of Henry's title, under the will of Cyprian, she designed and intended by her will to give him that same estate?

It matters not, in considering the question of intention, whether the testatrix was the owner of the lots attempted to be devised by Cyprian or not. If not the owner, her will, provided the manifestation of intention be clear, would only produce a case of election among those entitled under each will; whereas, upon the other supposition, it would amount to an implied devise of the specific property.

In Wright vs. Wyvill, (2 Ven. 56,) a testator bequeathed unto his wife six hundred pounds to be paid to W., saying it was for payment of lands lately purchased of W., *and was already estated as part of a jointure to his wife during her life.* It appeared that these lands had not been settled on the wife. The majority of the judges held that these expressions did not amount to a devise to her, believing that the testator did not intend to devise her anything, upon the ground that he mentioned, that she was estated in it before.

The case of Dashwood vs. Peyton, (18 Vesey, 27,) is a deliberate decision of Lord Eldon to the same purpose, and as the case is a leading one on the subject of recitals, we extract the principal facts from the reports. Sir Henry Peyton by his will, reciting that he was entitled for life under the will of his uncle, Sir Thomas Peyton, to the advowson of

the Rectory of Doddington, with remainders over, "subject to a direction in the said will, that my brother J. Dashwood, shall be presented to said Rectory, when it shall next become vacant, which it is my wish may be complied with; now 1 hereby declare it to be my desire and earnest wish that in case, upon the vacancy of said living, the said J. D. shall not be then living, or in case the said Rectory shall again become vacant, after the said J. D. shall have been presented to and accepted said presentation," then Algernon Peyton was to be presented.

The fact was, that under the will of Sir Thomas Peyton, J. Dashwood was only entitled to the presentation on a certain contingency, which had not happened. The question then arose, whether the expressions in the will of Sir Henry, raised a gift in him *by implication*, so as to put the persons actually entitled under the will of Sir Thomas, who took benefits under the will of Sir Henry, to their election.

Lord Eldon thought not. "The real question," said he, in an elaborate opinion upon the case, "is, whether this is to be considered as a case of election; and though it cannot be a direct devise, as the testator had nothing to give, it is clear that an effectual gift may be made, by raising a case of election; but for that purpose, a clear intention to give that which is not his property, is always required. If therefore it can be established, that the testator has expressly declared, or has shown a clear intention that James Dashwood should take this presentation, a case of election would be raised; but if upon the whole will taken together, it is obvious, *that the testator thought he had nothing to give to James, that he was already entitled,* and the testator under that supposition, has not given to him, or expressed an intention that he should take, *I find no authority for holding a mere recital, without more to amount to a gift, or demonstration of an intention to give.*"

Here it will be observed, that it was not pretended, that the recital in the will of Sir Henry Peyton, should be construed as a direct devise, because Sir Henry had no interest in the thing devised, but it was urged that the devisees of Sir Henry, who were also devisees of Sir Thomas, should be put to their election. Their right to do this in case the will should be construed as demonstrative of an intention on the part of Sir Henry, to make this disposition of the advowson, was admitted by the Lord Chancellor, and the principle upon which the case turned, was the absence of any indication of *intention* on the part of the testator. In a subsequent argument of this case, after the opinion above alluded to, had been given, the case of Tilly vs. Tilly was cited as an authority against the construction which Lord Eldon had given to the will. That case was one,

where the owner in fee of a trust estate, reciting that his wife was entitled to dower out of that estate, devised it; and the question was, whether that recital amounted to a devise to her of a third part of the rents and profits. The Chancellor, to whom this case was submitted, decreed an account, but with leave for the infant, (who was the devisee,) to move to set it aside, after she became of age, and also declared, that his decree should form no precedent, as he thought it a very hard case. But Lord Eldon disclaimed the doctrine of this case, and disregarded its authority.

The case of 'Tilly vs. Tilly, referred to in the case of Dashwood vs. Peyton, involved the same questions we are now considering. The testator, assuming as a fact what had no existence, to wit, the right of his wife to dower in a trust estate, devised that estate. In the principal case Apauline Clamorgan, reciting that her son Henry had been provided for by the will of his uncle Cyprian, devised her real estate, or the principal part of it, to her other children. The Chancellor who made the decree in the case of Tilly vs. Tilly, protested against its being regarded as a precedent, and Lord Eldon not only disregarded its authority, but intimated his dissatisfaction with the principle upon which it was decided. The case of Tilly vs. Tilly is therefore no authority, for the construction now contended for, and the case of Dashwood vs. Peyton is an authority pointedly against such a construction. There is a class of cases, in which the testator refers to a disposition as made in his will, (which in fact he has not made,) and the courts have supplied such omission. The ground upon which such implications are admitted is obvious enough. Such recitals manifest an unequivocal intention to make the disposition referred to. See Powell on Devises, 197.

So also there is another class of cases, in which a testator has made his will, and afterwards revokes some bequest in it, founding such revocations *on the assumption of a fact which turns out to be false.* In such cases, it is held, that the bequest is not revoked. The case of Campbell vs. French, (3 Ves. 321,) is one of this character. The testator, having bequeathed to his grand children, residing in America, £500, by a codicil, revoked the legacies, declaring in such codicil, that they were all dead, and it was proved that they were living. The principle of these cases does not conflict with the doctrine of Lord Eldon in Dashwood vs. Peyton, and indeed the case cited (Campbell vs. French,) was decided by him. There is an obvious difference between a question of revocation, and the construction of an original will, and the contesting parties bear a different relation to each other.

The case of Smart vs. Prujean has been referred to, but its applica-

30

bility to the facts of the present case, is not perceived. That a testator may refer to other unattested papers, and make them part of a properly attested will, is indisputable; but in that case there was no question as to the *intention* of the testator, to make certain papers, particularly described, a part of his will, though there was a dispute about the identity of the papers, and the case turned upon that point. The Chancellor was of opinion, that the papers produced, were not such as answered the description in the will. There was no question as to the intention of the testator to make the papers alluded to a part of his will; papers written by himself and addressed to his executors. There was no question in the present case, that Cyprian's will was sufficiently referred to in the will of Apauline, but whether Apauline designed to adopt its provisions by such reference.

The cases of Poulson vs. Wellington, (2 P. Wm. 533,) and Wilson vs. Piggott, (2 Ves. 351,) arose upon the construction of deeds, and illustrate the full extent to which the courts have gone in giving effect to mere recitals.

In Wilson vs. Piggott, a marriage settlement was made, by which, after the death of husband and wife, £4000 was to be paid to all and every, the child and children, other than an only, or eldest son, at such times and in such proportions, as the husband or wife, or the survivor, should appoint by deed or will; for want of such appointment, to be equally divided among such younger children, &c. There were four younger children; the marriage settlement of one of them recited, that she was entitled to £1000, part of this fund; one-fourth was appointed to another, on his marriage; and to a third, one thousand pounds, (£1000,) as her part of that fund, The question was, whether the recital in the marriage settlement, could be considered as a declaration that she was entitled to that sum. The Master of the Rolls thought it clear, that where a party had such a power, as the father in this case had, and demonstrated an intention so give the share to any child, the court would enforce it, without attention to the mode in which it was given. He therefore held that clause in the settlement, to be an appointment.

In Poulson vs. Wellington, (2 P. Wms. 533,) a widow of a freeman of London, who left children, and who died intestate, was entitled to four-ninths of his personal estate, and having by deed assigned over her four-ninths for her seperate use in case of marriage, and to such persons as she should appoint, and for want of such appointment, then to her children; the widow, in contemplation of a second marriage, by another deed, to which the intended husband was a party, in considera-

tion of the intended marriage, and of a settlement made on her by her intended husband, recited, that if she did not dispose of her four-ninths, the husband would be entitled thereto, and then assigned it over to trustees, in trust for the intended husband during their joint lives, subject to her control and disposal by writing, and died without making any disposition. Lord Chancellor King held, that as the husband was a purchaser of the four-ninths, and as it was recited in the last deed, that in case the wife died without making an appointment, the second husband would be entitled thereto, the recital amounted to an informal appointment.

In both these cases, there was much hesitation in making the decrees, and in both, the action of the Chancellor is based upon the assumption of a clear manifestation of intention on the part of the person making the deed. The cases are analogous to those we have heretofore alluded to, in which the testator recites a previous disposition, as having been made in his will, and the recital is admitted to be an informal devise. The party is aware of his rights, and of his power over the subject matter, and supposes that he has exercised that power in that, or another instrument.

Such cases cannot be cited to support the doctrine that a party, who is not aware that he has any interest in the subject matter, or any power over the same, may, by a mere recital that some other person has conveyed or disposed of the subject matter, make such recital his will or deed.

The third branch of the instruction asked of the circuit court, places the validity of Cyprian Clamorgan's will upon the principle, that the devisees of Apauline Clamorgan are *estopped* from denying the title of Henry, under the will of his uncle, Cyprian; that they cannot claim under the will, and at the same time refuse to abide by that portion of it which recognizes Henry's title. This position leaves the question of intention where it was before; it is merely a question between the right of election, and a direct devise, which we have already noticed, in commenting on the case of Dashwood vs. Peyton.

Apart from the considerations to which we have already adverted, the will itself presents some intrinsic obstacles to the contruction sought to be placed on it. Apauline Clamorgan, by her will, devises to her three children, Louis, Louisa, and Cyprian, "a certain lot or parcel of land, &c., bounded, south by a cross-street, commonly called Oak street; west, by Second, Main or Church street, &c." Now, lot No. 5, in the diagram had been sold to Fryer, and lot No. 3, by the will of Cyprian, was devised to Henry, so that in truth, no part of her lot, in

block 25, on the supposition that Cyprian's will was valid, bounded on Second street.

If a controling influence must be given to the words, "wishing and intending to place all my children upon an equal footing, in a pecuniary point of view," and also to the succeeding recital, in which Henry is said to be provided for by the will of Cyprian, we must adopt the maxim recognized by the civil law, *"Pater credens filium suum esse mortuum alteram instituit haeredem, filio domi, rediunte, hujus institutionis vis nulla."* But our statute would remedy the hardship of the case put by Cicero, and I have not seen any case in which that principle has been admitted as a principle of the common law. The nearest approach to it will probably be found in the cases of revocations made under a mistake, to which we have heretofore referred.

The third principal point discussed in this case, arises out of the position assumed by the defendant in error, that the deed from Louis Clamorgan to Hardage Lane of August, 1840, was confirmed by the conduct and declarations of Louis on the 24th and 27th July, 1841, and therefore passed all the title of Louis to said lot.

Some diversity of opinion has prevailed in relation to the manner in which the acts of an infant are to be avoided or confirmed, and what acts will amount to such avoidance or confirmation. The whole subject is fully discussed, and the learning on this question apparently exhausted in the opinion of Judge Story, in the case of Tucker vs. Moreland, 10 Peters. In that case the court do not adopt the opinion advanced by Lord Mansfield in Zouch vs. Parsons, that the distinction between void and voidable acts, rests solely upon the solemnity of the instrument, but consider that it depends also upon the character of the instrument, as prejudicial or advantageous to the infant. They hold that in general the deed of an infant is voidable only, by reason of its solemnity, unless it appears on its face to be to his prejudice, in which event it would be void. And this is declared to be the result of the English as well as American authorities. As to what acts will amount to a confirmation, the court held in that case, that where the act of an infant is by matter of record, he must avoid it by some act of record; if an act in *pais*, it may be avoided by an act in *pais* of equal solemnity and notoriety. A confirmation of a deed may be good without being by deed, as in case of a lease by an infant, and his receiving rent after he came of age; but it is very questionable whether a deed could be confirmed by mere words. The acts must be of such a " solemn and unequivocal nature, as to establish a clear intention to confirm the deed, after a full knowledge that it was voida-

Clamorgan, et al. vs. Lane.

ble.  Mere acquiescence, uncoupled with any acts demonstrative of an intent to confirm it, would be insufficient for the purpose."

This doctrine we do not consider inconsissent with the principles asserted by the supreme court of Tennessee, in the case of Wheaton vs. East, (5 Yerger 41.)  That court held, that a deed was not necessary to confirm that which was executed during infancy, because " that deed passed the interest in the estate, and being only voidable at the election of the infant, should he or his heirs fail to disaffirm, a good title will be vested, and no other person can call it in question, on account of the infancy of the grantor at the time it was executed.  Any thing therefore from which his assent after he arrives at age, may be fairly inferred, will be sufficient to affirm the deed made during infancy, and prevent him from afterwards electing to disaffirm it."  If these observations be taken in connection with the facts of the case, their propriety will be at once obvious.  The infant had permitted his alienee to remain in possession for several years after he became of age, and stood by (without objection) whilst large and valuable improvements were made upon the premises.  Such acts would be like the case of an infant lessor, receiving rent from his lessee after he became of full age.

With these principles for a guide, let us see in what light the expressions of Louis, on the 24th July, 1841, (the 25th being his birth day,) are to be regarded, so far as they have any tendency to confirm the deed to Dr. Lane of the preceding August.  On that day Louis came to the office of Mr. Gantt, who had sent for him with a view to procure his confirmation of his previous deed, by the execution of another, which Gantt had prepared for that purpose.  When asked to execute this deed of confirmation, Louis said he was perfectly willing; that the land was Dr. Lane's, and that he would execute a deed so soon as he was of age, but finally declined executing the deed which had been prepared, because of certain covenants contained therein, and the whole matter was deferred until Monday, (the 26th,) by which time, it was supposed, an interview would be had with Dr. Lane, and another deed prepared, conformably to Louis' views.  So far from confirming the deed of August, it would seem that he expressly declined doing so, at that time, and though he used some general expressions that the land was Dr. Lane's, yet such expressions, taken in connexion with his acts, cannot amount to a present confirmation, but only indicate a disposition to confirm at some future time, and on stipulated conditions.  From the statements and acts of Dr. Lane's agent, Louis must have inferred that a deed was necessary to a confirmation, and the execution of a deed he deliberately postponed.

The remaining point to be examined is the propriety of the action of the circuit court, in relation to the deed from Louis Clamorgan to Murray McConnell, filed for record on the 26th July, 1841, and withdrawn and cancelled on the 27th. The court excluded this deed as evidence of title in McConnell.

That a destruction of a deed for things lying in livery, does not destroy the estate which passed, may be regarded as settled law. Greenleaf Ev. 302; Jackson vs. Chase, 2d John Rep. 86. It may be also safely asserted, that in general, secondary evidence of the contents of such instrument, will be admitted upon proof of the fact of such destruction, even though the destruction be voluntary. This latter rule is not, however, of universal application, for cases have occurred, and will doubtless again occur, in which its literal application, unaffected by circumstances, would produce the most monstrous injustice. It is important then, in the present case, to look at the facts and circumstances attending this transaction, with a view to see how far it comes within the general principle, *touching the admissibility of secondary evidence.*

And first, let us examine the deed itself. This deed passes or purports to pass, " all the right, title, claim and interest, (of Louis Clamorgan,) both at law and equity, to block No. 25, (describing it,) which property formerly belonged to Jacques Clamorgan, and was handed down from him to his children, and willed by his son Cyprian to the said Louis Clamorgan." Does this deed convey any thing, but the interest which Louis derived, or supposed himself to derive from his uncle Cyprian ?

The word "*property*" is used indiscriminately to describe the *estate* which a man has in a tract of land, or the *land itself.* If the word in this deed be understood to mean the land itself, that is block No. 25, then the last clause of the description must be rejected. If the word property be understood to mean the estate or interest which Louis had in block No. 25, then the whole description is applicable, and the estate derived, or supposed to be derived, from Cyprian, was only conveyed. It is a paramount rule of interpretation to give effect, if it can be done consistently with the manifest intent of the parties, to every part of an instrument. If this cannot be done, then certain rules have been adopted in relation to what parts should first be disregarded; but it is the duty of a court called upon to fix the interpretation of an instrument, first to enquire how every part of the instrument can be made effectual. Applying this rule here, the deed of Louis to McConnell would then be a conveyance of all his right and interest, which was handed down

from Jacques Clamorgan, and willed by Cyprian Clamorgan to said Louis. Leaving out of view the fact that the will of Cyprian was void, and with a knowledge of the fact that Louis also derived an interest in this block from his mother, distinct from that he supposed himself to derive from his uncle, could any court hesitate to say that such a deed only conveyed the interest derived from Cyprian?

In giving a construction to this deed, as well as determining the right of McConnell to use it in evidence, for the purpose of affecting Lane with notice, the whole character of the transaction must be looked into. An infant may, for such is the law, sell a piece of land for a valuable and *bona fide* consideration to one, and so soon as he arrives at the age which the law fixes as the period of discretion, he may convey the same land to another, and thereby avoid the first deed. This is not considered a fraud on the part of the infant, nor does the party purchasing under such circumstances, and with a full knowledge of them, commit any fraud. The protection designed to be thrown over an infant, would be almost entirely nugatory, if the good or bad faith of the infant were permitted to influence the legal effect of his acts. Tucker vs. Moreland, 10 Pet. Rep. The transaction is not, however, favored by a court; if the party purchasing, under such circumstances, gets the legal advantage, he will not be deprived of it; but farther than this, the court is under no obligation to go.

There can be no doubt that McConnell and Collins were fully apprized of Lane's purchase in 1840; the testimony of Collins himself shows this; and there can be as little doubt that no sale had ever been made to McConnell previous to July 26th, 1841. They were fully aware of Louis' infancy, and therefore knew full well that no valid transfer could be made by Louis. It is true that Collins speaks of a previous *bargain*, made on his confidence in Louis' *honor*, but admitting there was such a parol agreement, it is very evident that the only consideration of this bargain on their part, was a house and lot on Broadway, the title to which, if they had any title at all, was not placed under the control of Louis.

The motive attributed to McConnell in withdrawing his deed of the 26th, and delivering it up to be cancelled, is certainly a singular one. McConnell & Collins appear, from this record, as business men, engaged to some extent, too, in the purchase of land or lots—familiar, we may presume, to some degree with even the forms of ordinary conveyances, (for the deed of the 26th was written by Collins,) is it probable that McConnell would think it necessary to procure a transfer of the dower of Louis' wife, that he should have destroyed or cancelled the deed

which he had from Louis, if that deed was in other respects satisfactory? A comparison of the two deeds is almost conclusive to the contrary. The second deed contains an express revocation of the deed to Lane, and is a clear conveyance of the whole of Louis' interest. The first, to say the least, is of doubtful import, and contains no reference whatever to the previous deed of Lane.

The question then recurs, shall McConnell, after having removed his deeds from the files of the recorder's office, and obliterated all evidence of its ever having been recorded, and delivered up the deed itself to be cancelled, with an intent to divest himself of all title under it, be permitted to claim priority by virtue of a second deed, on the ground of notice of the first? Is an actual notice of the first deed, notice of the second? Our statute makes the deed notice, not of a sale, but of the conveyance. The deed of confirmation to Lane, of July 26th, is not therefore affected by any notice of the first deed to McConnell, and it is not contended that Lane had any notice of the second deed to McConnell, of July 27th.

In relation to McConnell's right to rely upon his cancelled deed, as evidence of title, the obscurity of that instrument was, we think, sufficient under the circumstances, to justify the court in regarding it as no disaffirmance of the previous sale to Lane. An infant, it is conceded, may disavow his contracts, of however solemn a character, made during his infancy, but the act of disaffirmance must be unequivocal. Where the act may be fairly construed consistent with the previous attempt to convey, it should be so construed.

We have already alluded to the question touching McConnell's right to use this deed as evidence, under the facts of this case, supposing it to be an unequivocal disaffirmance of the sale to Lane, and a conveyance of his entire interest in block No. 25. Upon that question the court are not agreed. The cases of Commonwealth vs. Dudley, (10 Mass. Rep. 403,) and Holbrook vs. Tirrill (9 Pick. Rep. 105,) show the length to which the supreme court of Massachusetts have gone in giving a construction to the rules of evidence, by which the cancellation of a deed is indirectly made to divest the title. The supreme court of New Hampshire, in the case of Farrar vs. Farrar, (4 N. H. Rep. 194,) a case somewhat analagous to those in Massachusetts, have perhaps gone still farther. In all of these cases the title is admitted to be unaffected, but the party having voluntarily destroyed the evidence of that title, is not permitted to avail himself of it by secondary evidence.

Upon this point, however, no opinion is intended to be expressed.

Judge McBride concurring, the judgment is affirmed.

Scott, J.—I do not concur in so much of this opinion as maintains that Apauline's will did not confirm the devise made by Cyprian to Henry. The case of Dashwood vs. Peyton, is the case of an election. An election only arises where a testator devises something belonging to another, on the supposition that he has a right to do so, and in the same will gives an estate to him whose property he has devised away. In such a case the devisee cannot claim under the will and against it. He cannot take that which is given to him, and at the same time deny the right of the testator to devise away his property. Here Apauline did not convey away property to which she had no right. Either she or Cyprian had a right to this property. If Cyprian had a right, it passed by his will; if he had no right, then Apauline, by her will, adopted it as if it were her own. Any other construction works the grossest injustice. She declares her intention, by her will, to place her children on an equal footing in a wordly point of view, and yet in despite of this explicit declaration, she is made almost to disinherit one of them. As lands can pass by a will, a previous inoperative disposition of them may be set up by one. See Denn vs. Cornell, 3d Johns. Cases 174.